## AFFIDAVIT OF PETER MILLIGAN

I, Special Agent Peter Milligan, depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  I have been employed as an ATF Special Agent since April 2009 and am currently assigned to the Boston Group VI Field Office.  As an ATF Special Agent, my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by felons and other prohibited persons, and the use of firearms in drug trafficking/violent crimes, as well as the investigation of laws related to explosives violations and incendiary (arson) fires.

2.      I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy.  I have participated in numerous classes of in-service training relating to firearms/narcotics trafficking investigations and arson and explosives investigations.  I have been the affiant and/or participated in the execution of numerous state and federal search and arrest warrants pertaining to violations of the federal firearms, narcotics, arson, and explosives laws. I have participated in dozens of investigations relating to the illegal acquisition and sales of firearms and narcotics.  During those investigations, I have participated in surveillance, the purchase of firearms, the purchase of narcotics, the execution of search warrants, and I have interviewed witnesses, suspects, and informants.  Through my law enforcement training, participation in undercover purchases of firearms, surveillance of firearms traffickers, interviews of suspects, and participation in search warrants and Title III electronic surveillances, I am familiar with the methods that are most commonly used by unlawful firearms traffickers and people dealing in firearms without a Federal Firearms License.  Based on my training and experience as an ATF Special Agent, I am familiar with the federal firearms laws.

1

3.     This affidavit is based on a multi-agency investigation into the criminal activities of Joao Vitor Dos Santos Goncalves PIMENTA ("PIMENTA").  The agencies involved in the investigation include: the ATF and the Department of Homeland Security, Homeland Security Investigations ("HSI").

4.     Pursuant to this investigation, there is probable cause to believe that PIMENTA has violated federal law by engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A).  This affidavit is being submitted in support of an application for a criminal complaint charging PIMENTA with violation of 18 U.S.C. § 922(a)(1)(A), (the "Target Offense").

5.     During this investigation, a cooperating witness ("CW-1") made controlled purchases of commercially manufactured firearms, Privately Made Firearms ("PMF") (sometimes referred to as "ghost guns"), and commercially manufactured ammunition from PIMENTA. Unlike commercially manufactured firearms, a PMF or "ghost gun" does not have a serial number. Based on my training and experience, I am aware that a PMF satisfies the definition of "firearm" under 18 U.S.C. § 922(a)(1)(A).

6.     CW-1 has requested that his/her identity not be revealed for fear of reprisal or harm to their physical safety.  Based on these fears, CW-1 is seeking protection from law enforcement to include possible relocation.  I am aware of the identity of CW-1 and have met with him/her personally on numerous occasions.  CW-1 has provided accurate, truthful and reliable information to law enforcement, including the ATF, HSI, and local police departments, in the past and continues to do so.  CW-1 has no criminal history.  CW-1 is presently receiving monetary and immigration benefits from the ATF.

7.      The information contained in this affidavit is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, information from cooperating witnesses, public records, database checks, and other investigations.  The dates and times in this affidavit are approximate.  Because this affidavit is being submitted for the limited purpose of supporting issuance of a criminal complaint for PIMENTA, I have not presented every fact learned during the investigation but only that information necessary to fully support probable cause for the criminal complaint.

## PROBABLE CAUSE

8.      In July 2024, CW-1 provided information to ATF regarding PIMENTA trafficking firearms in and around central Massachusetts.  Thereafter, CW-1, working with law enforcement, made several controlled purchases of commercially manufactured firearms, Privately Made Firearms ("PMF"), and commercially manufactured ammunition from PIMENTA.

### July 31, 2024 – PMF Pistol and AR-15 Rifle Deal

9.      Beginning on or about July 30, 2024, CW-1 was in contact with PIMENTA regarding the sale of a PMF pistol.  PIMENTA sent CW-1 a video of the PMF pistol and quoted the price of $1500.  After some negotiation, PIMENTA agreed to meet CW-1 at the Stop & Shop, located at 99 Charles Street, Malden, MA (the "Stop & Shop"), on July 31, 2024, to sell the pistol to CW-1 for $1550.

10.     On or about July 31, 2024, PIMENTA agreed to meet CW-1 at the Stop & Shop to do the firearms sale.  Prior to the meeting, ATF agents searched CW-1's person for contraband with negative results.  Agents equipped CW-1 with a UC vehicle and a recording device which recorded both audio and video, and official government funds to purchase the firearm. CW-1 was under constant surveillance by law enforcement throughout the transaction.  CW-1 arrived at the

Stop & Shop and parked in the store's lot. CW-1 contacted PIMENTA to advise of his/her arrival. A short time later, PIMENTA arrived in a blue Honda Civic and parked on the passenger side of the UC vehicle. PIMENTA was the driver and was accompanied by two unknown males. PIMENTA exited the blue Honda Civic wearing a black cross-body bag and entered the front passenger side of the UC vehicle. PIMENTA removed the PMF pistol from the black cross-body bag and provided it to CW-1. PIMENTA conducted the sale of the PMF pistol in exchange for $1550. During the transaction, PIMENTA told CW-1 that he also had an AR-15 rifle inside of the blue Honda Civic that was for sale. PIMENTA advised CW-1 that it was the AR-15 from the video that was sent to CW-1 earlier that day. PIMENTA quoted CW-1 the price of $2800 for the AR-15 rifle. CW-1 advised PIMENTA to remain in the area and that he/she would contact him to meet and purchase the AR-15 rifle.

11.     After leaving the lot, CW-1 was kept under surveillance until he/she arrived at a prearranged meeting location. Once there, CW-1 provided agents with a Polymer 80, PMF, PF490C, 9 mm pistol. Agents searched CW-1 for contraband and found none. I have reviewed the recording of the meeting which confirmed CW-1's account of the transaction.

12.     On the same date, CW-1 contacted PIMENTA and advised that he/she had the $2800 to purchase the AR-15 rifle. PIMENTA agreed to meet CW-1 at the Stop & Shop and sell the AR-15 rifle. Prior to the meeting, ATF agents searched CW-1's person for contraband with negative results. Agents equipped CW-1 with a UC vehicle and a recording device which recorded both audio and video, and official government funds to purchase the firearm. CW-1 was under constant surveillance by law enforcement throughout the transaction. CW-1 arrived at the Stop & Shop and parked in the lot. PIMENTA arrived driving the blue Honda Civic and parked on the passenger side of the UC vehicle. Again, PIMENTA was accompanied by two unknown males.

4

PIMENTA entered the front passenger side of the UC vehicle.  PIMENTA advised CW-1 that the AR-15 rifle was in the trunk of the blue Honda Civic and instructed CW-1 to retrieve the firearm, which CW-1 refused to do.  PIMENTA got out of the UC vehicle and went to the trunk of the blue Honda Civic.  The unknown male passenger seated in the rear of the blue Honda Civic got out of the vehicle and met with PIMENTA at the trunk.  The unknown male retrieved the AR-15 rifle that was wrapped in a gray blanket and placed it on the rear seat of the UC vehicle.  The unknown male re-entered the rear compartment of the blue Honda Civic, while PIMENTA re-entered the front passenger side of the UC vehicle.  Both CW-1 and PIMENTA reached to the rear compartment of the UC vehicle and inspected the rifle.  PIMENTA conducted the sale of the AR-15 rifle in exchange for $2800.

13.     After leaving the lot, CW-1 was kept under surveillance until he/she arrived at a prearranged meeting location.  Once there, CW-1 provided agents with a Colt, M4 Carbine, 5.56 caliber rifle, serial number LE162743.  Agents again searched CW-1 for contraband and found none.  I have reviewed the recording of the meeting which confirmed CW-1's account of the transaction.

August 5, 2024 – Smith & Wesson Pistol Deal

14.     On or about August 5, 2024, PIMENTA agreed to meet CW-1 at the Stop & Shop to do a firearms sale.  Prior to the meeting, ATF agents searched CW-1's person for contraband with negative results.  Agents equipped CW-1 with a UC vehicle and a recording device which recorded both audio and video, and official government funds to purchase the firearm. CW-1 was under constant surveillance by law enforcement throughout the transaction.  CW-1 traveled the Stop & Shop and observed PIMENTA, in a Blue Honda Civic, already parked in a space in the lot. CW-1 contacted PIMENTA to advise of his/her arrival.  Moments later, PIMENTA parked on the

5

passenger side of the UC vehicle.  PIMENTA was the driver and was accompanied an unknown female and an unknown male.  PIMENTA exited the blue Honda Civic wearing a black cross-body bag and entered the front passenger side of the UC vehicle.  PIMENTA removed the Smith & Wesson pistol from the black cross-body bag and provided it to CW-1.  PIMENTA conducted the sale of the Smith & Wesson pistol in exchange for $1550.  During the transaction, CW-1 and PIMENTA discussed future firearms transactions.

15.    After leaving the meeting location, CW-1 was kept under surveillance until they arrived at a prearranged meeting location.  Once there, CW-1 provided agents with a Smith & Wesson, SD9VE, 9mm pistol, bearing serial number FYR4068.  Agents again searched CW-1 for contraband and found none.  I have reviewed the recording of the meeting which confirmed CW-1's account of the transaction.

August 16, 2024 – Two Pistol and Ammunition Deal

16.    On or about August 16, 2024, PIMENTA agreed to meet CW-1 at the Stop & Shop to sell CW-1 two pistols.  Prior to the meeting, ATF agents searched CW-1's person for contraband with negative results.  Agents equipped CW-1 with a UC vehicle and a recording device which recorded both audio and video, and official government funds to purchase the firearms. CW-1 was under constant surveillance by law enforcement throughout the transaction.  CW-1 arrived at the Stop & Shop and parked in the lot.  A short time later, PIMENTA arrived in a blue Honda Civic and parked on the passenger side of the UC vehicle.  PIMENTA was the driver and was accompanied an unknown male who was seated in the front passenger seat.  PIMENTA exited the blue Honda Civic wearing a cross-body bag and entered the front passenger side of the UC vehicle. PIMENTA removed both pistols from the cross-body bag and provided them to CW-1.  PIMENTA

also provided CW-1 with a plastic baggie containing ammunition.  PIMENTA conducted the sale of the two pistols and ammunition in exchange for $2350.

17.     After leaving the lot, CW-1 was kept under surveillance until he/she arrived at a prearranged meeting location.  Once there, CW-1 provided agents with: (1) a Ruger, LCP MAX, .380 caliber pistol, bearing serial number R75-504189, with one round of .380 caliber ammunition loaded in the magazine; (2) a Calwestco, J-22, .22 LR caliber pistol, bearing serial number 293224: and (3) a white plastic zip lock baggie containing six rounds of .22 LR caliber ammunition.  Agents again searched CW-1 for contraband and found none.  I have reviewed the recording of the meeting which confirmed CW-1's account of the transaction.

August 19, 2024 – Two Pistol and Ammunition Deal

18.     On or about August 19, 2024, PIMENTA agreed to meet CW-1 at the Stop & Shop to sell CW-1 two pistols.  Prior to the meeting, ATF agents searched CW-1's person for contraband with negative results.  Agents equipped CW-1 with a UC vehicle and a recording device which recorded both audio and video, and official government funds to purchase the firearms. CW-1 was under constant surveillance by law enforcement throughout the transaction.  CW-1 arrived at the Stop & Shop and parked in the lot.  CW-1 was in contact with PIMENTA to ascertain his estimated time of arrival.  A short time later, PIMENTA arrived in a blue Honda Civic and parked on the passenger side of the UC vehicle.  PIMENTA was the front passenger and was accompanied an unknown male driver and an unknown female who was seated in the rear passenger seat. PIMENTA exited the blue Honda Civic carrying a black bag and entered the front passenger side of the UC vehicle.  PIMENTA removed both pistols from the black bag and provided them to CW-1.  PIMENTA then provided CW-1 with a pistol holster and pistol magazines that were loaded

with ammunition.  PIMENTA conducted the sale of the two pistols and ammunition in exchange for $3050.  During the transaction, CW-1 and PIMENTA discussed future firearms transactions.

19.     After leaving the lot, CW-1 was kept under surveillance until he/she arrived at a prearranged meeting location.  Once there, CW-1 provided agents with: (1) a HS Produkt (IM Metal), XD9 sub-compact, 9mm pistol, bearing serial number HD924544; (2) a Polymer 80, PMF, PF940C, 9mm pistol; (3) a pistol magazine loaded with seven rounds of 9mm ammunition; (4) a pistol magazine loaded with ten rounds of 9mm ammunition; and (5) a pistol holster. Agents again searched CW-1 for contraband and found none.  I have reviewed the recording of the meeting which confirmed CW-1's account of the transaction.

August 22, 2024 – HS Produkt Pistol and Ammunition Deal

20.     On or about August 22, 2024, PIMENTA agreed to meet CW-1 at the Stop & Shop and to sell CW-1 a pistol.  Prior to the meeting, ATF agents searched CW-1's person for contraband with negative results.  Agents equipped CW-1 with a UC vehicle and a recording device which recorded both audio and video, and official government funds to purchase the firearm. CW-1 was under constant surveillance by law enforcement throughout the transaction. CW-1 arrived at the Stop & Shop and parked in the lot.  CW-1 was in contact with PIMENTA to advise of his/her arrival.  Moments later, PIMENTA arrived in a blue Honda Civic and parked on the passenger side of the UC vehicle.  PIMENTA was the driver and was accompanied by an unknown female who was seated in the front passenger seat.  PIMENTA exited the blue Honda Civic carrying a black bag and entered the front passenger side of the UC vehicle.  PIMENTA removed the pistol from the black bag and provided it to CW-1.  PIMENTA then provided CW-1 with a pistol magazine that was loaded with ammunition.  PIMENTA conducted the sale of the pistol and ammunition in exchange for $1550.  During the transaction, CW-1 and PIMENTA

briefly discussed the sale of several rifles from a photograph that PIMENTA sent CW-1 prior to the transaction.

21.     After leaving the lot, CW-1 was kept under surveillance until he/she arrived at a prearranged meeting location.  Once there, CW-1 provided agents with a HS Produkt (IM Metal), XDM Elite, 9mm pistol, bearing serial number BB190094 and a pistol magazine loaded with six rounds of 9mm ammunition.  Agents again searched CW-1 for contraband and found none.  I have reviewed the recording of the meeting which confirmed CW-1's account of the transaction.

August 26, 2024 – Two AR-15 Rifle Deal

22.     On or about August 26, 2024, PIMENTA agreed to facilitate a meeting at the Stop & Shop between CW-1 and a second individual ("SUBJECT 2") (who has been identified by ATF) in order to sell two AR-15 rifles.  Prior to the meeting, ATF agents searched CW-1's person for contraband with negative results.  Agents equipped CW-1 with a UC vehicle and a recording device which recorded both audio and video, and official government funds to purchase the firearm. CW-1 was under constant surveillance by law enforcement throughout the transaction. CW-1 arrived at the Stop & Shop and parked in the lot.  A short time later, PIMENTA arrived in a blue Honda Civic and parked in the lot.  PIMENTA was the driver of the blue Honda Civic and was accompanied by an unknown female who was seated in the front passenger seat.  PIMENTA got out of the blue Honda Civic and entered the front passenger side of the UC vehicle.  CW-1 and PIMENTA waited in the UC vehicle for the arrival of SUBJECT 2.  During the wait, PIMENTA had several contacts with SUBJECT 2 to ascertain his estimated time of arrival.  During one of the contacts with SUBJECT 2, SUBJECT 2 attempted to get CW-1 and PIMENTA to meet at a residence in Everett, MA, to conduct the deal.  Both CW-1 and PIMENTA refused to go to the Everett residence.  A short time later, SUBJECT 2 arrived in a blue Toyota Prius and parked on

the passenger side of the UC vehicle.  SUBJECT 2 was accompanied by an unknown male who was seated in the front passenger seat.  PIMENTA got out of the UC vehicle and entered the rear of the blue Toyota Prius.  Moments later, PIMENTA got out of the blue Toyota Prius with a large black suitcase.  PIMENTA put the suitcase on the rear seat of the UC vehicle and entered the front passenger side of the UC vehicle.  At approximately the same time, CW-1 got out of the driver's side and entered the rear of the UC vehicle to inspect the contents of the suitcase.  CW-1 opened the suitcase and observed two AR-15 rifles.  CW-1 removed the two AR-15 rifles from the suitcase and placed them on the rear floorboard.  SUBJECT 2 then removed the suitcase from the rear of the UC vehicle.  PIMENTA got out of the front passenger side of the UC vehicle and entered the rear compartment with CW-1.  At approximately the same time, SUBJECT 2 entered the front passenger side of the UC vehicle.  CW-1 provided PIMENTA with the $6000 in official government funds.  PIMENTA counted the money and provided SUBJECT 2 with a portion of the $6000.  PIMENTA and SUBJECT 2 conducted the sale of the two AR-15 rifles in exchange for $6000.

23.     After leaving the lot, CW-1 was kept under surveillance until he/she arrived at a prearranged meeting location.   Once there, CW-1 provided agents with two Anderson Manufacturing, AM-15 rifles, serial numbers 23077153 and 23077179.  Agents again searched CW-1 for contraband and found none.  I have reviewed the recording of the meeting which confirmed CW-1's account of the transaction.

        August 30, 2024 – Two Pistol and Ammunition Deal

24.     On or about August 30, 2024, PIMENTA agreed to meet CW-1 at the Stop & Shop and to sell CW-1 two pistols.  Prior to the meeting, ATF agents searched CW-1's person for contraband with negative results.  Agents equipped CW-1 with a UC vehicle and a recording

device which recorded both audio and video, and official government funds to purchase the firearm. CW-1 was under constant surveillance by law enforcement throughout the transaction. CW-1 arrived at the Stop & Shop and parked in the lot. CW-1 was in contact with PIMENTA to ascertain his estimated time of arrival. A short time later, PIMENTA arrived in a gray Honda Civic and parked to the front of the UC vehicle. PIMENTA was the front passenger and was accompanied an unknown male who was the operator of the gray Honda Civic. PIMENTA exited the gray Honda Civic carrying a backpack and entered the front passenger side of the UC vehicle. PIMENTA removed one of the pistols from the backpack and provided it to CW-1. The pistol contained a magazine that was loaded with ammunition. PIMENTA removed the second pistol from the backpack and provided it to CW-1. PIMENTA then provided CW-1 with a white plastic bag containing ammunition. PIMENTA conducted the sale of the two pistols and ammunition in exchange for $3050. During the deal, PIMENTA advised him/her that he had recently been robbed at gun point in Boston during an attempted purchase of firearms.

25.     After leaving the lot, CW-1 was kept under surveillance until he/she arrived at a prearranged meeting location. Once there, CW-1 provided agents with: (1) a Ruger, Security 9, 9mm pistol, bearing serial number 385-75665, containing a magazine loaded with fifteen rounds of 9mm ammunition; (2) a Tisas – Trabzon Gun Industry Corp., Zig PC 1911, .45 caliber pistol, bearing serial number T0620-21AK00958;  and (3) a white plastic bag containing six rounds of .45 caliber ammunition. Agents again searched CW-1 for contraband and found none. I have reviewed the recording of the meeting which confirmed CW-1's account of the transaction.

September 6, 2024 – Smith & Wesson M&P 15-22 Rifle Deal

26.     On or about September 6, 2024, PIMENTA agreed to meet CW-1 at the Stop & Shop and to sell CW-1 an AR-15 style firearm. Prior to the meeting, ATF agents searched CW-

1's person for contraband with negative results.  Agents equipped CW-1 with a UC vehicle and a recording device which recorded both audio and video, and official government funds to purchase the firearm. CW-1 was under constant surveillance by law enforcement throughout the transaction. CW-1 was in contact with PIMENTA while en route to the Stop & Shop.  CW-1 arrived at the Stop & Shop and parked in the lot.  Moments later, PIMENTA arrived in a blue Honda Civic and parked on the passenger side of the UC vehicle.  PIMENTA was the driver and was accompanied an unknown female who was seated in the front passenger seat.  PIMENTA exited the blue Honda Civic and retrieved a laundry basket containing clothing from the rear of the vehicle.  PIMENTA placed the laundry basket in the rear compartment of the UC vehicle.  PIMENTA entered the front passenger side of the UC vehicle and conducted the sale of the AR-15 style firearm in exchange for $3000.

27.     After leaving the lot, CW-1 was kept under surveillance until they arrived at a prearranged meeting location.  Once there, CW-1 provided agents with a Smith & Wesson, M&P 15-22, .22 LR caliber rifle, bearing serial number LAE6613.  Agents again searched CW-1 for contraband and found none.  I have reviewed the recording of the meeting which confirmed CW-1's account of the transaction.

28.     Agents were able to identify that a Massachusetts Driver's license had been issued on or about July 2, 2024 for a Joao Vitor Pimenta.  When comparing the Massachusetts Driver's license image of Joao Vitor Pimenta to the individual in the recorded controlled firearms transactions, I believe that the individual is Joao Vitor Dos Santos Goncalves PIMENTA.

29.     Based on a query of the ATF Federal Licensing System, it has been determined that PIMENTA do not possess a license to engage in the business of dealing firearms.

## **CONCLUSION**

30.     Based on the information set forth above, I have probable cause to believe that Joao Vitor Dos Santos Goncalves PIMENTA engaged in the business of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A).  Accordingly, I respectfully request that the Court issue the attached criminal complaint and warrant for the arrest of PIMENTA.


Peter Milligan /by Paul G. Levenson
Peter Milligan
Special Agent, ATF



Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by


HON. PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

on this ___13th___ day of September, 2024

13